IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| ELANA KINGSBURY, individually and as surviving spouse of MICHAEL KINGSBURY, | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) ) | |
| GENERAL MOTORS LLC, | ) ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, Elana Kingsbury, individually and as surviving spouse of Michael Kingsbury, deceased, (hereinafter referred to as "Plaintiff"), and respectfully files this Complaint against General Motors LLC (hereinafter referred to as "Defendant"), and in support hereof would state and show the following:

### I. Parties

1. Plaintiff Elana Kingsbury is an individual and the surviving spouse of Michael Kingsbury, deceased. She resides in and is a citizen and resident of Lawrenceburg, Lawrence County, Tennessee.

2. Defendant General Motors LLC is a Delaware limited liability company with its principal place of business in Michigan. Its sole member is General Motors Holdings LLC, a Delaware limited liability company with its principal place of business in Michigan. General Motors Holdings LLC's sole member is General Motors Company, a Delaware corporation with its principal place of business in Michigan. Service of process upon this Defendant may be had

by serving its registered agent for service, Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

3. Decedent, Michael Kingsbury, was a citizen and resident of Lawrenceburg, Lawrence County, Tennessee at the time of his death.

## II. Jurisdiction

4. This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. § 1332.

5. The parties to this lawsuit are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## III. Facts

6. On or about September 15, 2016, Michael Kingsbury was driving a 2012 Chevrolet Cruze (VIN# 1G1PK5SC8C7150939) traveling northbound on Highway 169 in Johnson, Indiana. Elana Kingsbury was a passenger in the vehicle.

7. The subject vehicle was designed by Defendant.

8. The subject vehicle was manufactured by Defendant.

9. The subject vehicle was also assembled and tested by Defendant.

10. For unknown reasons, Michael Kingsbury lost control of the subject vehicle, causing it to leave the roadway and roll.

11. At the time of the accident, Elana Kingsbury and Michael Kingsbury were properly seated and properly wearing the available seat belts.

12. However, despite being properly seated and wearing the available 3-point seat belt, Michael Kingsbury sustained fatal injuries and Elana Kinsbury suffered serious injuries during the accident when the vehicle failed to protect them because it violated several crashworthiness principles.

2

13. There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

   1. Maintain survival space;
   2. Provide proper restraint throughout the entire accident;
   3. Prevent ejection;
   4. Distribute and channel energy; and
   5. Prevent post-crash fires.

14. When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

15. The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

16. Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of an accident versus the cause of an injury.

3

17. Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death **following** an accident through the use of a vehicle's various safety systems.

18. Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

19. General Motors has stated in the past that, "The rich don't deserve to be safer … Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

20. Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

21. Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle. Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

22. It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

23. In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly

4

profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

24. This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

25. Most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public." Accordingly, since paramount means "superior to all others", all vehicle engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles.

26. Although it is true that there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards do not adequately protect the public.

27. Indeed, Joan Claybrook, former administrator of the NHTSA, wrote a letter to major auto makers where she said, "Our federal safety standards are and were intended by Congress to be minimum standards. The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance rather than floors from which to improve safety."

28. Additionally, in September of 2014, a Congressional report was issued in response to the General Motors ignition switch recall. The report questioned whether NHTSA had the technical expertise, culture and analytic tools needed to address safety issues. The report stated, "NHTSA also lacked the focus and rigor expected of a federal safety regulator". It was also stated that NHTSA staff has a "lack of knowledge and awareness regarding the evolution of vehicle safety systems they regulate."

29. Thus, it is clear that a prudent manufacturer's research and analysis should not stop with standards compliance. When it knows—or, through reasonable diligence, should know—that a product design presents a latent hazard or foreseeable risk of injury, it should go above and beyond the minimum requirements set forth in mandatory standards, rules, and/or regulations.

### IV. Cause(s) of Action as to Defendant

30. It was entirely foreseeable to and well-known by Defendant that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

31. The injuries complained of occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

32. Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question.

33. As detailed herein, the vehicle contains and/or Defendant has committed either design, manufacturing, marketing, assembling, and/or testing defects.

34. Defendant either knew or should have known of at least one safer alternative design which would have prevented the fatal injuries to Michael Kingsbury and the serious injuries to Elana Kingsbury.

35. In addition to the foregoing, Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the vehicle was unreasonably dangerous as designed,

6

manufactured, assembled, marketed, and/or tested because Defendant knew and/or should have known of the following, non-exhaustive list of defects:

    a. The vehicle fails to provide proper occupant safety during rollover events to the lower spine;

    b. The vehicle fails to provide proper restraint during rollover events because the lower spine suffers burst fractures;

    c. The vehicle fails to provide proper restraint through the seat and underbody to channel, distribute and transfer injurious Z forces;

    d. The vehicle fails to provide proper restraint by securing the restrained occupants to their seat;

    e. The vehicle violates principles of crashworthiness;

    f. The vehicle was not properly tested with rollover testing to evaluate Z loading on the spine;

    g. The vehicle was not properly tested with drop tests to evaluate Z loading on the spine;

    h. The seat was not properly tested to evaluate Z loading during various types of accident events;

    i. The vehicle structure was not properly tested to evaluate Z loading during various type of accident events;

    j. The vehicle violated principles of consumer expectations because consumers do not expect to break their spine in rollover events;

    k. The Defendant failed to conduct proper testing to mitigate injurious Z loads;

    l. The Defendant failed to conduct proper engineering analysis to mitigate injurious Z loads; and

m. The defects, negligence and violations of consumer expectation were the direct, substantial, producing and/or proximate cause of the injuries and damages.

36. Defendant was further negligent in the manufacture, assembly, marketing, and/or testing of the vehicle in question.

37. Defendant failed to conduct proper testing and engineering analysis during the design, development, and/or testing of the vehicle.

38. The vehicle was not subjected to rigorous engineering analysis.

39. In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death.

40. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

41. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

42. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

43. A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously injure someone is negligent.

44. Based upon information and/or belief, Defendant either used or knew about advanced safety features used in Europe, Australia, Japan and some other country and chose not to offer those safety features to American consumers.

45. Defendant's occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

46. When Defendant designed the subject vehicle, it did not reinvent the wheel. Defendant used an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior vehicle. This knowledge would have been utilized in different aspects of the various designs of the subject vehicle.

47. Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendant is also in possession of what, if any, engineering analysis it performed.

48. However, it is expected that after all of these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

49. Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendant knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

50. The foregoing acts and/or omissions, defects, and/or negligence of Defendant were the producing, direct, proximate, and/or legal cause of Michael Kingsbury's fatal injuries, Elana Kingsbury's serious injuries and Plaintiff's damages.

## V. Damages to Plaintiff

51. Plaintiff seeks recovery for all available damages under any applicable statute and/or common law of the state of Tennessee.

52. As a result of the acts and/or omissions of the Defendant, Elana Kingsbury sustained multiple and severe injuries and continues to suffer and will in the future suffer severe and excruciating pain and discomfort of the body and mind.

53. As a result of the acts and/or omissions of the Defendant, Elana Kingsbury incurred great expense for medical attention in an effort to cure her injuries and will require further and additional medical, social, and psychological treatment at great expense and cost to her.

54. As a result of the acts and/or omissions of the Defendant, Elana Kingsbury suffered lost wages in the past and in all likelihood will into the future as result of her injuries.

55. As a result of the acts and/or omissions of the Defendant, Michael Kingsbury suffered excruciating pain, discomfort of body and mind, mental and physical suffering, and eventually death and loss of time.

56. As a result of the acts and/or omissions of the Defendant, Elana Kinsbury and Michael Kingsbury incurred great expense for Michael Kingsbury's medical attention.

57. As a result of the acts and/or omissions of the Defendant, Elana Kingsbury incurred great expense for Michael Kingsbury's funeral and burial.

58. As a result of the acts and/or omissions of the Defendant, Elana Kingsbury has been and will in the future continue to be deprived of her husband's consortium, society, valuable services, care, support, maintenance, advice, counsel, reasonable contributions of pecuniary value, and suffered other damages resulting to her, including emotional distress, pain and mental suffering, impairment, disfigurement, interference with her daily activities and a reduced capacity to enjoy life as a result of her injuries.

59. The above and foregoing acts and/or omissions of the Defendant, resulting in the fatal injuries to Michael Kingsbury and the serious injuries to Elana Kingsbury have caused actual damages to Plaintiff in excess of the minimum jurisdictional limits of this Court.

## VI. Prayer

60. For the reasons presented herein, Plaintiff prays that Defendant be cited to appear and answer, and that upon a final trial of this cause, Plaintiff recover judgment against Defendant for:

   a. Actual damages;

   b. Economic and non-economic damages;

   c. Prejudgment and post-judgment interest beginning September 15, 2016;

   d. Costs of suit; and

   e. All other relief, general and special, to which Plaintiff is entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

/s/Ryan P. Durham
Ryan P. Durham (BPR # 22073)
Cameron Hoffmeyer (BPR # 32173)
Boston, Holt, Sockwell & Durham, PLLC
Post Office Box 357
235 Waterloo Street
Lawrenceburg, Tennessee 38464
(931) 762-7167
*Attorneys for Elana Kingsbury*